SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.

     Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE,

     Defendant.

Civil Action No. 1:18-cv-0245-CRC

### (U) **DECLARATION OF DAVID M. HARDY**

(U) I, David M. Hardy, declare as follows:

(1)    (U) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.[1] I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    (U) In my official capacity as Section Chief of RIDS, I supervise approximately

---

[1] (U) IMD was formerly known as the Records Management Division, or RMD.

Classified By: ▮▮▮▮▮▮
Derived From: Multiple Sources
Declassify On: 20431231

SECRET//NOFORN

SECRET//NOFORN

242 employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters

("FBIHQ") units and two (2) field operational service center units whose collective mission is to

effectively plan, develop, direct, and manage responses to requests for access to FBI records and

information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN

FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and Presidential and Congressional directives.  My responsibilities also include the

review of FBI information for classification purposes as mandated by Executive Order 13526,

and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA.  I

have been designated by the Attorney General of the United States as an original classification

authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)     (U) Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Specifically, I am

aware of the FBI's handling of plaintiff Judicial Watch's FOIA request for three categories of

records concerning surveillance under the Foreign Intelligence Surveillance Act of 1978

("FISA"), which is at issue in this litigation.  In response to this request, the FBI issued a so-

called Glomar response, whereby it neither confirmed nor denied the existence or non-existence

of responsive records.  Due to intervening events, the FBI pierced that Glomar response in a

limited fashion, acknowledged the existence of four FISA applications and resulting orders

2

SECRET//NOFORN

regarding Carter Page, and processed those four packages for release. The FBI retained its

Glomar response as to the existence or non-existence of any other responsive records.

(4)   (U)  First, the FBI processed 598 pages, which is the totality of the four Page

FISA applications and orders; released five pages in whole and 407 in part, with information

redacted pursuant to FOIA exemptions; and withheld 186 pages in full pursuant to FOIA

exemptions. The FBI relied on the following FOIA exemptions in redacting information or

withholding pages: FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and

(b)(7)(E). *See* 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), and (b)(7)(A), (C)-(E). Second, the FBI

processed an additional 21 pages of records regarding responses from the Foreign Intelligence

Surveillance Court ("FISC") about one or more proposed FISA applications. Those pages are

being withheld in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A),

(b)(7)(C), (b)(7)(D), and (b)(7)(E).

(5)   (U)  This declaration is being submitted in support of DOJ's motion for summary

judgment on the partial Glomar response and on the processing of plaintiff's FOIA request.

## (U) **ADMINISTRATIVE HISTORY**

(6)   (U)  Plaintiff submitted a FOIA request to the FBI dated July 19, 2017,

requesting:

> 1.  Copies of all proposed and all final signed FISA applications submitted to the
>     FISC relating to Russian interference in the 2016 election, allegations of
>     collusion between people associated with the Trump campaign and Russia,
>     and any known Trump associates regardless of context;
>
> 2.  Copies of all FISC responses to the above-mentioned applications in which
>     the Court notified the FBI or Justice Department that it would not grant the
>     proposed applications or recommended changes. If any such FISC responses
>     were provided orally, rather than in writing, please provide copies of FBI or
>     Justice Department records memorializing or otherwise referencing the
>     relevant FISC responses;

3

SECRET//NOFORN

SECRET//NOFORN

3.   Copies of all FISC orders relating to the above-mentioned applications
     whether denying the applications and certifications, denying the orders,
     modifying the orders, granting the orders, or other types of orders.

(*See* **Exhibit A.**)

(7)      (U)  In a letter dated July 27, 2017, the FBI acknowledged receipt of plaintiff's

FOIA request and assigned it FOIPA Request No. 1380709.   (*See* **Exhibit B.**)

(8)      (U)  By letter dated August 7, 2017, the FBI issued a Glomar response to

plaintiff's request, declining to confirm or deny the existence of responsive records because

either a positive or negative response to the request would cause harms protected against by

FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E), 5 U.S.C. §§552(b)(1), (b)(3),

(b)(7)(A), and (b)(7)(E).  The letter notified plaintiff of its administrative appeal and dispute

resolution rights.  (*See* **Exhibit C.**)

(9)      (U)  In a letter dated November 2, 2017, plaintiff filed an administrative appeal

with the Department of Justice Office of Information Policy ("OIP") arguing that "the FBI has

done nothing more than quote the statutory language of the claimed exemptions" and "has not

met its burden under FOIA." (*See* **Exhibit D.**)

(10)      (U)  By letter dated December 14, 2017, OIP responded to plaintiff's appeal

(Appeal No. DOJ-AP-2018-000876) and affirmed the FBI's determination. (*See* **Exhibit E.**)

(11)      (U) Plaintiff filed this FOIA lawsuit on February 2, 2018. *See* ECF No. 1,

Complaint.

(12)      (U)  As described above, due to events occurring after this lawsuit was filed, the

FBI pierced its Glomar response in a limited fashion and processed four FISA applications and

FISC orders related to Carter Page.  On July 20, 2018, the FBI released all reasonably

4

SECRET//NOFORN

SECRET//NOFORN

segregable, non-exempt portions of those FISA materials. *(See* **Exhibit F.)**

(13)     (U) The FBI also conducted a search for records responsive to Item 2 of plaintiff's request and concluded that all responsive pages must be withheld in full to prevent harms under multiple FOIA exemptions. The FBI has not previously communicated this determination to plaintiff but is hereby notifying it of the decision to withhold these pages in full.

### (U) CARTER PAGE FISA APPLICATIONS AND FISC ORDERS

#### (U) BACKGROUND

(14)     (U) The Foreign Intelligence Surveillance Act of 1978, or FISA, establishes procedures for the physical search, electronic surveillance, and collection of "foreign intelligence information" between "foreign powers" and "agents of foreign powers" suspected of espionage or terrorism. 50 U.S.C. § 1801(b). The statute also created the FISC to oversee requests for surveillance warrants by federal law enforcement and intelligence agencies.

(15)     (U) The FISC meets in secret, and approves or denies requests for search warrants. Proceedings before the FISC are generally *ex parte* and non-adversarial. *But see* 50 U.S.C. § 1803(i)(2)(A). The court hears evidence presented solely by DOJ, and unlike most opinions rendered by other Federal courts, there is no provision for the publication or release of FISC opinions or other information regarding FISC hearings.[2]

(16)     (U) FISA is, itself, an intelligence method and details of its use are classified, and prohibited from disclosure under the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). Specifically, the identity of a target of a FISA application/warrant is a classified fact, as are the dates of FISA authorized surveillance, the types and locations of authorized

---

[2] (U) Under some circumstances, certain FISC opinions and orders have been released in response to FOIA requests or as part of Intelligence Community ("IC") transparency efforts. *See* 50 U.S.C. § 1872.

SECRET//NOFORN

SECRET//NOFORN

surveillance methods and tools, and other details about the authorized surveillance. Accordingly, FISA applications previously have never been disclosed publicly, including under the FOIA or through IC transparency efforts. The disclosure of the four Carter Page FISA applications is unprecedented.

(17)   (U) In July 2016, the FBI opened an investigation of "the Russian government's efforts to interfere in the 2016 Presidential election[.]"[3]  As part of this investigation, in October 2016, the FBI first sought and obtained a FISA warrant to conduct surveillance on Carter Page. Like any other FISA application and resulting order, the existence of the Carter Page FISA was a classified fact. The Government thereafter sought and obtained three renewals from the FISC to continue surveilling Page. The existence of each of those applications and resulting orders was also classified.

(18)   (U) Separately, in March 2017, the House Permanent Select Committee on Intelligence ("HPSCI") announced an investigation into "the Russian active measures campaign targeting the 2016 U.S. election." *See* https://intelligence.house.gov/news/ documentsingle.aspx?DocumentID=767.  Although not originally part of the scope of that investigation, HPSCI added additional areas of inquiry, including the purported abuse of FISA. *See* https://intelligence.house.gov/uploadedfiles/hpsci_russia_investigation_one_page_summary. pdf. As part of its investigation, HPSCI sought and was ultimately provided access to the Carter Page FISA applications and orders.

---

[3] (U) On March 20, 2017, then-FBI Director James B. Comey publicly confirmed the existence of this investigation in testimony before Congress, stating "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).

SECRET//NOFORN

SECRET//NOFORN

(19)    (U) On May 17, 2017, Acting Attorney General Rod Rosenstein appointed
Robert S. Mueller as Special Counsel. *See* DOJ Order No. 2915-2017 (May 17, 2017).  Under
the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation
confirmed by then-FBI Director James B. Comey in testimony before the House Permanent
Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination
between the Russian government and individuals associated with the campaign of President
Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and
(iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."  The FBI's FISA authorized
surveillance on Page continued after the Special Counsel was appointed.

(20)    (U) In February 2018, the HPSCI Majority and Minority issued two memoranda
regarding HPSCI's Russia investigation, which are often colloquially referred to by the names of
the HPSCI Chairman and Ranking Member – *i.e.*, as the "Nunes Memo" and the "Schiff
Memo."  As originally drafted, both memoranda were classified because they revealed FISA
authorized surveillance on an identified target – Carter Page.[4]

(21)    (U) HPSCI voted to release the Nunes Memo publicly but could not immediately
do so because it was classified at the Top Secret level.  Thus, pursuant to clause 11(g) of Rule X
of the House of Representatives, HPSCI forwarded the Nunes Memo to President Trump with a
request to declassify it.  The declassification request did not ask the President to opine on the
judgments and conclusions of the HPSCI Majority.

---

[4] (U) Under classification rules, an entire document is classified if any single piece of information in it is
classified. So, for example, an entire document is classified as Top Secret if it contains any Top Secret information,
even if it also contains Secret, Confidential, or unclassified information. Moreover, information that by itself is
unclassified can become classified when combined or associated with other unclassified or classified information, if
the compiled information reveals an association or relationship that meets the standards and criteria for classification
(*i.e.*, when disclosure of the compiled information would, itself, reveal classified information).

SECRET//NOFORN

SECRET//NOFORN

(22)   (U)  On February 2, 2018, President Trump declassified the Nunes Memo "in

light of the significant public interest in the memorandum." *See* Letter from Donald F. McGahn

II, Counsel to the President, to Devin Nunes, Chairman of HPSCI (Feb. 2, 2018).  HPSCI

thereafter publicly released the Nunes Memo with a cover letter authored by Mr. McGahn

documenting the President's action (which was also noted on the Nunes Memo itself with a

stamp stating "Declassified by order of the President February 2, 2018").  Mr. McGahn's cover

letter made it "clear [that] the Memorandum reflects the judgments of its congressional authors."

*See* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-

SD001.pdf.

(23)   (U)  Subsequently, the HPSCI Minority submitted the Schiff Memo to DOJ,

asking for a classification review.  The FBI conducted the review requested by the HPSCI

Minority and identified those portions of the Schiff Memo that contained classified information

unaffected by the President's declassification of the Nunes Memo.[5]

(24)   (U)  The FBI did not declassify any additional information during the review of

the Schiff Memo, nor did the HPSCI Minority request any further declassification.  Rather, the

FBI conducted a review to identify what information remained classified, in light of the

President's declassification of the Nunes Memo.  The HPSCI Minority redacted those portions of

the Schiff Memo that the FBI identified as classified, and then released the redacted

memorandum. *See* https://docs.house.gov/meetings/ig/ig00/20180205/106838/hmtg-115-ig00-

20180205-sd002.pdf.

---

[5] (U) The President's declassification of the Nunes Memo resulted only in the declassification of the
classified information contained in that memorandum.  It did not broadly declassify all information contained in or
related to the Carter Page FISA applications and orders.

8

SECRET//NOFORN

(25) (U) As with the HPSCI Majority, the HPSCI Minority did not ask the FBI to opine on their judgment or conclusions, and the FBI did not do so. And as with the Nunes Memo, the Schiff Memo reflects the judgments of its congressional authors.[6]

(26) (U) Although DOJ and the FBI had previously and properly refused to confirm or deny the existence of any records responsive to plaintiff's request on the grounds that doing so could reasonably be expected to reveal classified information, among other things, the President's declassification of the existence of the Carter Page FISA applications and orders, through his declassification of the Nunes Memo, pierced that Glomar response as to the four FISA applications and resulting orders referenced in the Nunes Memo.[7]

(27) (U) As a result of the President's declassification of the existence of four Carter Page FISA applications and orders, DOJ and the FBI undertook a FOIA review of the four sets of applications and orders to determine whether any information necessarily had to be disclosed in light of the President's declassification order. On July 20, 2018, the FBI produced all reasonably segregable, non-exempt portions of those four FISA packages in response to plaintiff's FOIA request at issue in this case, among others.[8]

---

[6] (U) On January 4, 2018, Senators Grassley and Graham referred to DOJ their allegations that Christopher Steele had violated 18 U.S.C. § 1001. The referral memorandum referenced the Page FISA applications/orders and identified Steele, a classified intelligence source. Thus, the memorandum was classified. After the declassification of the Nunes Memo and the release of the Nunes and Schiff Memos, the FBI was asked to conduct a classification review of the referral memorandum so that the Senate could publicly release it. The FBI conducted that classification review and identified the portions that remained classified following the declassification of the Nunes Memo. The memorandum reflects the Senators' judgments and conclusions; they did not ask the FBI to opine on them and the FBI did not do so as part of its classification review.

[7] (U) The Nunes Memo referenced an initial FISA application and order from October 2016, and three renewals thereafter.

[8] (U) Because the FBI received more than three requests to which the Carter Page FISA packages were responsive, the records were posted to The Vault, the FBI electronic reading room, on July 21, 2018. *See* 5 U.S.C. § 552(a)(2)(D)(ii)(II).

SECRET//NOFORN

(28)    (U)  Substantial portions of the Page FISA materials remain classified; the President's declassification of the Nunes Memo resulted in the declassification of a relatively limited amount of information.  Thus, the information that remains classified was protected pursuant to FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1).  Furthermore, as previously noted, the materials contain investigative information relevant to the pending investigation into Russia's interference in the 2016 Presidential election.  Disclosure of this withheld relevant information (none of which exactly matches that disclosed in the Nunes, Schiff, or Grassley/Graham Memos) could reasonably be expected to interfere with this active and pending investigation.[9]  *See* 5 U.S.C. § 552(b)(7)(A).  The FISA packages also contain information from and about intelligence sources, and detailed information about intelligence methods, including non-public information about FISA surveillance.  This information was also protected.  *See* 5 U.S.C. §§ 552(b)(3), (b)(7)(D), (b)(7)(E).  Finally, these documents contain personally-identifying information about DOJ and FBI personnel and other third parties, which was withheld pursuant to the FOIA.  *See* 5 U.S.C. §§ 552(b)(6), (b)(7)(C).

(29)    (U)  Plaintiff's request is broader than the four acknowledged applications and resulting orders, however.  As discussed further below, the FBI's original Glomar response was pierced only in a very limited fashion for those four acknowledged applications and resulting orders.  It remains in place as to any other responsive applications and orders, with one other exception.  Specifically, on March 20, 2017, then FBI Director James B. Comey specifically addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama

---

[9] (U)  While the three Congressional memoranda each reflect statements by the Legislative Branch, not the Executive Branch, in light of the President's actions with respect to the Congressional memoranda, the FBI identified and released any information contained in the four Page FISA packages that matched information released in the Congressional memoranda.

SECRET//NOFORN

SECRET//NOFORN

had had President Trump's "'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping
> directed at him by the prior administration, I have no information
> that supports those tweets and we have looked carefully inside the
> FBI. The Department of Justice has asked me to share with you
> that the answer is the same for the Department of Justice and all its
> components. The Department has no information that supports
> those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian

Interference in the 2016 U.S. Election, March 20, 2017. https://www.washingtonpost.com/news/

post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-

interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last access 6/12/2017).

(30)    (U) Aside from this statement, the acknowledgment of the four Page FISA

applications and accompanying FISC orders, and the records identified in response to Item 2 of

plaintiff's request (discussed below), neither the FBI nor DOJ have publicly commented on or

acknowledged the existence or non-existence of any other FISA records within the scope of

plaintiff's FOIA request, and the FBI's Glomar response remains intact as to the existence or

non-existence of any other responsive records.

(U) SEARCH

(31)    (U) In most instances when searching for records to respond to a FOIA request,

RIDS's first step is to conduct a search of the FBI's Central Records System ("CRS"). Such a

search was not necessary here. In this case, a known universe of responsive records was

revealed through the release of the Nunes and Schiff Memos. Specifically, the memoranda

revealed the existence of four FISA applications submitted for surveillance on Carter Page,

starting in October 2016 and continuing through three renewals, with accompanying FISA

orders.   FBI FOIA personnel consulted with FBI personnel familiar with the Russia

11

SECRET//NOFORN

SECRET//NOFORN

investigation to locate the four Page FISA packages. Through these efforts, the FBI was able to

locate each of the four packages. At the same time, the FBI also contacted DOJ's National

Security Division ("NSD"), which represents the Government before the FISC, to obtain copies

of all four applications that NSD had submitted to the FISC and all accompanying orders on the

applications. NSD provided the FBI copies of all four packages for processing. The FBI then

confirmed that between its records and the NSD records, it had complete copies of each of the

four FISA packages on Carter Page that had been revealed by the Nunes and Schiff Memos.

(32) ⋅ (U)  With respect to the portion of plaintiff's request seeking "proposed

applications," the FBI understands that to reference to Rule 9(a) of the FISC Rules of Procedure,

which requires that DOJ provide proposed applications at least a week in advance of the filing of

the final application for the FISC's consideration, except in emergency authorization situations.

The FBI consulted with knowledgeable staff members responsible for managing the FISA

process and maintaining the FISA database at the FBI, who advised that the FBI does not

formally maintain a database or other repository of proposed applications as referenced in FISC

Rule 9(a) in its holdings.  Rather, the process outlined in the FISC Rule 9 is one engaged in

between DOJ's National Security Division ("NSD") and the FISC.  Individual FBI employees

who worked on the Page FISAs reported that they possess one or more draft versions of at least

some of the applications.  However, there is no way for the FBI to determine if any of those

drafts are the proposed applications actually submitted to the FISC without having the actual

proposed applications, which the FBI does not maintain.[10]  Accordingly, the FBI does not have

possession, custody, or control of records responsive to this portion of plaintiff's request.

---

[10] (U)  Plaintiff requested "proposed applications," a term specifically defined in FISC Rule 9(a), and the FBI interpreted its request as seeking those specific records and not all drafts of the applications.

SECRET//NOFORN

(33)    (U)    In responding to Item 2 of plaintiff's request, the FBI did not conduct a

CRS search. Rather, FBI FOIA personnel started by asking FBI personnel familiar with the Page

FISA applications whether the FISC notified the FBI or DOJ that it would not grant any of the

applications or recommended changes to any of them. As a result of that consultation, FBI FOIA

personnel learned that the FISC does not communicate directly with the FBI and did not advise

DOJ that it would not grant any of the applications, but did provide feedback to DOJ about at

least one application, which DOJ then conveyed to the FBI. An FBI employee who was in

communication with DOJ about this searched his e-mails and was able to provide leads for the

FBI to identify custodians who potentially would have records responsive to this portion of

plaintiff's request. The FBI then searched those employees' e-mails for the relevant time

period(s) associated with the application(s) about which the FISC conveyed feedback, using the

following search terms: the name and e-mail address of the NSD attorney who communicated

the FISC's feedback to the FBI[11]; "FISC"; and "court." As a result of these search efforts, the

FBI located 20 pages of e-mails (some of which are duplicative) between FBI and NSD

personnel and internally between FBI personnel discussing oral feedback from the FISC; the FBI

also located a one-page attachment to one of the e-mails. None of these records documented or

discussed "recommended changes" communicated by the FISC to DOJ; nevertheless, the FBI

construed plaintiff's request liberally and treated these records discussing FISC feedback as

responsive to its request. The FBI has concluded that these pages are wholly exempt under

FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

---

[11] (U) The name of the attorney is separately being protected pursuant to FOIA Exemptions (b)(6) and (b)(7)(C), the basis for which is discussed further below.

SECRET//NOFORN

## (U) **FOIA EXEMPTIONS**

(34)    (U)  The FBI carefully reviewed, processed, released to plaintiff (and others), and posted to The Vault all non-exempt portions of the four Page FISA packages (applications and orders) that were revealed in the Nunes Memo.[12]  In conjunction with DOJ, the FBI conducted a thorough review of each page and redacted information or withheld pages in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(35)    (U)  In addition, the FBI located 21 pages of records responsive to Item 2 of plaintiff's request and has determined that they must be withheld in full pursuant to Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(36)    (U)  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of non-exempt material.  No reasonably segregable, non-exempt portions have been withheld.  To further describe the information withheld could reveal the very material which the FBI seeks to protect.

(37)    (U)  On the pages released to plaintiff, each redaction is marked by two pieces of information:  a FOIA exemption (*e.g.*, "(b)(6)") and a code (*e.g.*, "-1").  The FOIA exemption marking shows that the redaction contains information determined to be exempt under that particular exemption.  The code corresponds to a particular category of information determined to be exempt.  For example, where "(b)(6)-1" appears on a document, it signals that the FBI relied on FOIA Exemption (b)(6), which protects against unwarranted invasions of personal privacy, to protect a particular category of information – *i.e.*, the names and/or other identifying information of FBI Special Agents or Support Personnel.

---

[12] (U) The released pages are Bates numbered "17-cv-597 (FBI)-1" through "17-cv-597 (FBI)-412."  A chart identifying which exemptions were cited on which pages is attached hereto as **Exhibit G.**

SECRET//NOFORN

SECRET//NOFORN

(38)   (U) The coded categories applied to the 21 pages withheld in full in response to Item 2 are: (b)(1)-1; (b)(3)-1; (b)(5)-1, -2, and -3; (b)(6)/(b)(7)(C)-1, -2, -3, and -5; (b)(7)(A)-1; (b)(7)(D)-1; and (b)(7)(E)-1, -2, -3, -4, -6, and -9.  The coded categories applied to the 186 pages withheld in full from the Page FISAs are: (b)(1)-1; (b)(3)-1; (b)(6)/(b)(7)(C)-2; (b)(7)(A)-1; and (b)(7)(E)-1, -2, -3, and -6.

(39)   (U) A key to the coding system applied to the Carter Page FISA records follows:

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| **Exemption (b)(1)** | **Classified Information** |
| (b)(1)-1 | Information properly classified by an FBI Original Classification Authority pursuant to Executive Order 13526 |
| **Exemption (b)(3)** | **Information Protected by Statute** |
| (b)(3)-1 | Intelligence sources and methods, prohibited from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **Exemption (b)(5)[13]** | **Privileged Information** |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney-Client Privilege |
| (b)(5)-3 | Attorney Work Product Privilege |
| **Exemptions (b)(6) and (b)(7)(C)[14]** | **Unwarranted Invasions of Personal Privacy** |
| (b)(6)-1 (b)(7)(C)-1 | Names of and/or other information about FBI Special Agents and Support Employees |
| (b)(6)-2 (b)(7)(C)-2 | Personally-identifying and other non-public information about Carter Page |
| (b)(6)-3 (b)(7)(C)-3 | Names of and/or other information about one FISC Employee and two NSD Employees |
| (b)(6)-4 (b)(7)(C)-4 | Information sufficient to identify a third party who was a source of information relied upon in the Carter Page FISA applications |
| (b)(6)-5 (b)(7)(C)-5 | Names of and/or other information about third parties merely mentioned in the Item 2 records |
| **Exemption (b)(7)(A)** | **Pending Enforcement Proceedings** |
| (b)(7)(A)-1 | Information which, if disclosed, could reasonably be expected to interfere with the pending Russia investigation |

---

[13] (U) Exemption (b)(5) is asserted only as to the Item 2 records.

[14] (U) Category (b)(6)/(b)(7)(C)-5 is asserted only as to the Item 2 records.

SECRET//NOFORN

SECRET//NOFORN

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| **Exemption (b)(7)(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names of or other identifying information about individuals who provided information under an express assurance of confidentiality, and any information that they provided |
| **Exemption (b)(7)(E)**[15] | **Investigative Techniques and Procedures** |
| (b)(7)(E)-1 | Information revealing the investigative focus of an investigation |
| (b)(7)(E)-2 | Information about the collection and/or analysis of information |
| (b)(7)(E)-3 | Information that would reveal the specific techniques authorized for and used in national security investigations |
| (b)(7)(E)-4 | Information about specific databases utilized by the FBI for investigative and law enforcement purposes |
| (b)(7)(E)-5 | Information about monetary payments in relation to utilization of investigative techniques, such as the payment of confidential human sources |
| (b)(7)(E)-6 | Information about the targets, dates, and scope of surveillance |
| (b)(7)(E)-7 | Information that would reveal the dates and types of investigations (*i.e.*, preliminary investigations, full investigations) |
| (b)(7)(E)-8 | Information that would reveal investigative strategies for utilizing particular evidence |
| (b)(7)(E)-9 | Code Name |

### (U) *Exemption (b)(1) – Classified Information*

(40)    (U)  Given that FISA applications and orders, by their nature, contain sensitive classified intelligence information, and given that the declassification of the Nunes Memo did not impact all information in the four Page FISA packages, it should be unsurprising that the FBI protected a relatively significant amount of information under Exemption (b)(1) here.  Similarly, the records responsive to Item 2 concern feedback provided by the FISC about one or more FISA applications and included classified information that the FBI properly protected under Exemption (b)(1).

(41)    (U)  Exemption (b)(1) protects from disclosure records that are (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of

---

[15] (U)  Category (b)(7)(E)-9 is asserted only as to the Item 2 records.

SECRET//NOFORN

SECRET//NOFORN

national defense or foreign policy; and (B) in fact properly classified pursuant to such Executive Order. 5 U.S.C. § 552(b)(1).

(42)    (U) The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps. The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive and procedural criteria of the Executive Order.

(43)    (U) E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense or foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying information. I am bound by its requirements when making classification determinations.

(44)    (U) For information to be properly classified, and thus properly withheld pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth in E.O. 13526 § 1.1(a), which requires:

> (1)    an original classification authority must have classified the information;
>
> (2)    the information must be owned by, produced by or for, or be under the control of the United States Government;
>
> (3)    the information must fall within one or more of the categories of information listed in § 1.4 of [the] order; and
>
> (4)    the original classification authority must determine that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority must be able to identify or describe the damage.

(45)    (U) The information covered by Exemption (b)(1) here is under the control of the United States Government, falls within applicable categories of E.O. 13526 § 1.4, and requires a

17

SECRET//NOFORN

SECRET//NOFORN

classification marking at the TOP SECRET level because unauthorized disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security, or at the SECRET level because the unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security.  *See* E.O. 13526 § 1.2(a)(1)-(2).

(46)   (U)  In addition to these substantive requirements, certain procedural and administrative requirements set forth in E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents. Specifically, E.O. 13526 requires that:

(a)   Each document was marked as required and stamped with the proper classification designation.  *See* E.O. 13526 § 1.6(a)(1) – (5).

(b)   Each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b).  *See* E.O. 13526 § 1.6(a)(5)(c).

(c)   The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were followed.

(d)   The declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed.

(e)   Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

(47)   (U)  With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the four Page FISA applications and accompanying orders is currently and properly classified at the TOP SECRET or SECRET level pursuant to E.O. 13526, and satisfies both the procedural and substantive requirements set forth in the Executive Order.

18

SECRET//NOFORN

(48)     (U)  Specifically, this information is owned by, was produced by or for, and is under the control of the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the TOP SECRET or SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526 § 1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources," *see* E.O. 13526 § 1.4(d), because unauthorized disclosure of this information could be expected to cause exceptionally grave damage to national security (for information classified at the TOP SECRET level) or serious damage to national security (for information classified at the SECRET level). This is discussed further below.

(49)     (U)  I examined the information protected in this case pursuant to Exemption (b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States.  This information was not examined in isolation.  Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files.  Equal consideration was given to the impact that other information – both in the public domain and likely known or suspected by present or potential adversaries of the United States – would have upon the information protected here.

(50)     (U)  The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found.  This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities.  It is my judgment that any greater specificity in

SECRET//NOFORN

the descriptions and justifications set forth with respect to information relating to intelligence activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

(U) *E.O. 13526 § 1.4(c) – Intelligence Activities, Sources and Methods*

(U) **Overview**

(51)    (U) E.O. 13526 § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology." An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity, source, or method has two characteristics. First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(52)    (U) Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

20

SECRET//NOFORN

SECRET//NOFORN

(53)    (U)  Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them.  One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.  We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.  Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(U)  **Information Protected In This Case**

(54)    (U)  As discussed below, information withheld under Exemption (b)(1) in conjunction with E.O. 13526 § 1.4(c) would, if disclosed, reveal otherwise non-public information regarding:  the FBI's intelligence interests, priorities, activities, and methods; undisclosed intelligence sources or methods upon which the FBI relied in support of its application for FISA coverage on Carter Page, as well as undisclosed portions of intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods, including the specific details of the surveillance of Carter Page authorized by the FISC via the four applications and orders publicly revealed in the HSPCI memoranda.  All of this information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

(U)  **Intelligence Activities and Methods**

(55)    (U)  In the four Page FISA applications and accompanying orders, the FBI protected details about intelligence activities undertaken by the FBI and the methods utilized

21

SECRET//NOFORN

SECRET//NOFORN

during those intelligence activities. This information includes the details about the FISA surveillance sought and obtained through the four Page FISA applications and accompanying orders, but also includes information about other intelligence activities and methods utilized by the FBI that were included in the responsive records. The Item 2 records also include details about the FISA surveillance authority sought and about other intelligence activities and methods utilized by the FBI.

(56)   (U)  With regard to the FISA surveillance of Page, the withheld information reveals the specific surveillance method(s) sought and authorized by the FISC, including citations to relevant legal authorities that would reveal the specific method(s) sought or authorized with respect to a specific individual during a particular timeframe.

(57)   (S//NF) ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████

22

SECRET//NOFORN

SECRET//NOFORN



  (58) (U) The withheld information also reveals:  descriptions of and the particulars

about implementing the authorized surveillance method(s); information that would reveal the

exact periods of FISA authorized surveillance[16]; what information was being sought through the

surveillance; and any information obtained as a result of the FISA-authorized surveillance of

Page included in the second through fourth applications.

  (59) (S//NF)



---

[16] (U) This includes the FISC docket numbers and the specific dates on which coverage was sought and authorized (including as reflected in the "declassify on" dates in the classification blocks).

SECRET//NOFORN



(61)    (U) The withheld information also reflects intelligence-gathering activities, including specific intelligence methods used and information obtained in broader contexts. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-301-302, 304-308, 311-312, 317-319, 324-325, 353, and 386.

(62)    (U) Finally, the withheld information includes information about Source #1's intelligence reporting activities and the period of time he served as an intelligence source for the FBI. While some information about Source #1 has been declassified and disclosed, other information remains classified and has not been publicly disclosed. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-308-316.

(63)    (S//NF) ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
██████████████████████

(64)    (U) The FBI also protected a classified investigation code name. A code name is unique and assigned solely to a particular investigation. Code names are used in lieu of the actual name, description, and information concerning a specific investigation of national security

24

SECRET//NOFORN

interest. Public disclosure of a code name may allow an adversary or hostile analyst to patch bits and pieces of information together that, once assembled, will inform them of the possible range of our intelligence capabilities and penetration, and the extent of the intelligence that the FBI has likely already gathered. A particular investigation's code name may be used or referenced throughout multiple cases and in relation to multiple intelligence sources/activities, thus connecting those cases, sources, and intelligence activities. Applying a mosaic analysis, adversaries or hostile analysts could use these code names in conjunction with other information known about other investigations, law enforcement techniques, or intelligence activities, sources, and methods to assess the range of the FBI's intelligence capabilities and evaluate the probable intelligence that the FBI has gathered or may be able to collect on a particular subject.

(65)   (U)  The disclosure of the above-described types of information could reasonably be expected to cause serious damage to the national security, as it would: (a) reveal actual intelligence activities undertaken by the FBI, and the methods used in doing so, regarding specific targets and during specific periods of time; (b) disclose the intelligence-gathering capabilities of the methods; and (c) provide an assessment of the level of penetration by the FBI of specific targets during the specific time period. Armed with such information, adversaries, including hostile foreign governments, could implement actions to thwart the FBI's intelligence activities and weaken or negate the particular intelligence methods, which would severely disrupt the FBI's intelligence-gathering capabilities. Accordingly, this information is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

(66)   (U)  The FBI also concluded that the specific amounts of payments made to intelligence sources reflected in the records is classified intelligence method information.

SECRET//NOFORN

SECRET//NOFORN

Without adequate context, the particular amount paid to a particular intelligence source could be viewed to suggest the relative volume of information provided by a particular source, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's intelligence activities. Moreover, disclosure would reveal non-public information about the level of resources devoted to particular targets or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its intelligence gathering mission. Revealing the amount of money the FBI has paid to particular intelligence sources and over particular periods of time would reveal the FBI's level of focus on certain intelligence gathering efforts. Revealing this level of focus would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence-gathering activities. This would give sophisticated adversaries and hostile governments the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI's strength areas and exploit its weak ones. Accordingly, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

### (U) Intelligence Sources

(67)    (U) An intelligence source who requires continued classification is one that provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to the FBI's

SECRET//NOFORN

SECRET//NOFORN

intelligence-gathering capabilities.

(68)   (U)   Although some information about Source #1 and his activities has been declassified and publicly disclosed, the four Page FISA applications include information about other intelligence sources.  Similarly, the Item 2 records include information about an intelligence source.  This information, including specific information about the sources themselves as well as the information they provided, is singular in nature and, if disclosed, reasonably could be expected to identify the contributing sources.

(69)   (U)   Disclosure of the identities of intelligence sources could reasonably be expected to jeopardize their livelihoods, their families and other relationships, and even their lives.  Moreover, disclosure of one source can reasonably be expected to cause other current and potential intelligence sources to fear that their identities will be publicly revealed at some point. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-308-319.

(70)   (U)   Within the e-mails located in response to Item 2, a code-named intelligence source is identified; that code name and information provided by the source that is singular in nature and would be identifying was protected.  Intelligence source code names are unique and assigned solely to a particular source.  They are used in lieu of the actual name of the source for the purpose of protecting the source's identity.  Disclosure of a source's code name could permit adversaries or hostile analysts to match it throughout documents and other publicly-available information to identify the source.  Disclosure could also permit adversaries and hostile analysts to assess the possible range of the FBI's intelligence capabilities and evaluate the probable intelligence that the FBI has gathered or may be able to collect on a particular subject.

(71)   (U)   Thus, the release of source-identifying information can reasonably be

SECRET//NOFORN

SECRET//NOFORN

expected to cause damage to the national security by causing current intelligence sources to cease providing information, and discouraging potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point.  Such a source reaction would eliminate one of the Intelligence Community's most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's intelligence and investigative missions.  Accordingly, some of the protected intelligence source information here is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the TOP SECRET level, for intelligence source information that could reasonably be expected to cause exceptionally grave damage to the national security, and some of the protected intelligence source information here is currently and properly classified at the SECRET level, for intelligence source information that could reasonably be expected to cause serious damage to the national security.  The FBI properly withheld this information under Exemption (b)(1).[17]

<div align="center">(U) <i><b>E.O. 13526 § 1.4(d) – Foreign Relations or Foreign Activities</b></i></div>

(72)     (U)  E.O. 13526 § 1.4 (d) authorizes the classification of information about foreign relations or foreign activities of the United States, including confidential sources.  Such information includes information gathered from/with the assistance of and/or about foreign countries.  It is sensitive due in part to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments.

(73)     (U)  The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or

---

[17] (U)  The intelligence source information protected in the Item 2 records and in the FISA orders is classified at the SECRET level only.  The FISA applications include information classified at both the SECRET and the TOP SECRET levels.

<div align="center">28</div>

SECRET//NOFORN

SECRET//NOFORN

economic retaliation against the United States; the loss of the cooperation and assistance of friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. Due to the nature of the information here, the FBI cannot provide any more specific details on the public record about its basis for redacting information pursuant to E.O. 13526, § 1.4(d) and Exemption (b)(1). However, as the FBI's classified portions of this declaration demonstrate, this information is currently and properly classified and was appropriately redacted by the FBI.

(74)    (S//NF) 

(75)    (U) Thus, the FBI protected such information because, if disclosed, it could reasonably be expected to cause serious damage to national security. Because this information remains currently and properly classified, pursuant to E.O. 13526 § 1.4(c), the FBI properly protected it under Exemption (b)(1).

(U) *Exemption (b)(3) – Information Protected by Statute*

(76)    (U) Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or

SECRET//NOFORN

SECRET//NOFORN

refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3)(A). If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it must specifically cite this paragraph in order for Exemption (b)(3) to apply. *Id.* at § 552(b)(3)(B).

(77)   (U)  As explained above, the four Page FISA applications and resulting orders, as well as the Item 2 records, include information that is classified pursuant to E.O. 13526 § 1.4(c) to protect intelligence sources and methods, which the FBI has protected under Exemption (b)(1) (*see* paragraphs 60-63). Those same intelligence sources and methods are also exempt here under Exemption (b)(3). Specifically, their disclosure is prohibited pursuant to the National Security Act of 1947, as amended, which provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

(78)   (U)  As relevant to the FBI's application of Exemption (b)(3), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its face, leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.

(79)   (U)  In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. §§ 3024(i)(1). The FBI is one of the member agencies comprising the IC, and as such must protect intelligence sources and methods.

(80)   (U)  Accordingly, the information in the Page FISA applications, the resulting

30

SECRET//NOFORN

SECRET//NOFORN

FISC orders, and the Item 2 records that reveals intelligence sources and methods is prohibited from disclosure pursuant to 50 U.S.C. § 3024(i)(1) and thus exempt from disclosure under Exemption (b)(3).

(81)   (S//NF) 

31

SECRET//NOFORN

SECRET//NOFORN

## (U) *Exemption (b)(5) – Privileged Information*

(82)    (U) Exemption (b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

(83)    (U) Exemption (b)(5) has been construed to exempt documents or information normally privileged in the civil discovery context, and incorporates the deliberative process, attorney-client, and attorney work product privileges.  Generally, the deliberative process privilege protects predecisional, deliberative communications that are part of a process by which agency decisions are made.  It protects materials prepared as part of an agency decisionmaker's formulation of opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations.  The attorney-client privilege protects confidential communications from a client to an attorney and from an attorney to a client for the purpose of seeking and providing legal advice.  The privilege covers client-supplied information and opinions given by an attorney based on and reflecting that information.  The attorney work product privilege protects documents and other memoranda prepared by an attorney or under the direction of an attorney as part of, or in reasonable anticipation of, litigation.

## (U)  **(b)(5)-1**  **Deliberative Process Privilege**

(84)    (U) The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions.  Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations may properly be withheld.  Disclosure of this type of information would have an inhibiting effect upon agency decision-making and the development of policy because it would chill full and frank discussions between agency personnel and

32

SECRET//NOFORN

SECRET//NOFORN   ·

decision makers regarding a decision.  If agency personnel knew that their preliminary impressions, opinions, evaluations, or comments would be released for public consumption, they would be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision.

(85)   (U) In order to invoke the deliberative process privilege, the protected information must be both "predecisional" and "deliberative."  Information is "predecisional" if it temporally precedes the decision or policy to which it relates.  It is "deliberative" if it played a direct part in the decision-making process because it consists of recommendations or opinions on legal or policy matters, or reflects the give-and-take of the consultative process.

(86)   (U) The FBI relied on the deliberative process privilege as part of its rationale for withholding the Item 2 records in full.  The records reflect discussions between NSD and the FBI, and internal FBI discussions, about how to respond to the questions posed by the FISC.  The predecisional requirement is satisfied here because these discussions preceded the final decision(s) about how to respond to the FISC's questions.  The deliberative requirement is satisfied because the discussions were part of the process by which DOJ determined how to respond to the FISC's feedback.  Since the information protected here was both predecisional and deliberative, the FBI properly protected it under Exemption (b)(5).

(U) **(b)(5)-2**   **Attorney-Client Privilege**

(87)   (U) The attorney-client privilege is appropriately asserted to protect confidential communications between a client seeking legal advice from a professional legal adviser in his/her capacity as a lawyer.  Such communications are permanently protected from disclosure by the legal adviser unless the client waives the protection.  This privilege encompasses confidential communications made to an agency attorney by decision-making personnel as well

33

SECRET//NOFORN

SECRET//NOFORN

as lower echelon employees who possess information relevant to an attorney's advice-rendering function. Disclosure of the communications between attorneys and their clients would impede the full disclosure of all of the information that relates to the client's reasons for seeking legal advice, which is necessary if the professional mission is to be accomplished.

(88)   (U) The Item 2 records reflect communications between NSD and FBI, as well as FBI investigative personnel and FBI attorneys, in which confidential (and classified) information was provided by the FBI clients to their attorneys (in FBI's Office of the General Counsel and to NSD counsel) for the purpose of legal advice about responding to the FISC's questions. Disclosure of such communications between these attorneys and their clients would inhibit clients from being completely candid with their attorneys in relation to the issues about which they are seeking legal advice. Such candor and full disclosure is necessary in order to ensure that thorough and sound legal advice is provided. Accordingly, the FBI properly protected such privileged communications here.

## (U) <u>(b)(5)-3   Attorney Work Product Privilege</u>

(89)   (U) The attorney work product privilege protects such tangible and intangible items as interviews, memoranda, correspondence, mental impressions, and personal beliefs prepared or developed by an attorney in anticipation of litigation. For purposes of this privilege, litigation is anticipated when the Government is investigating a suspected agent of a foreign power. Here, in the Item 2 materials, the discussions and assembly of response(s) to the FISC, which were directed by the NSD attorney, as well as FBI counsel, were part of NSD's preparation of the court materials and reflect the attorneys' legal theories, strategies, and opinions. The purpose of the privilege is to ensure that such preparation occurs without intrusive or needless scrutiny. For this reason, the FBI relied on Exemption (b)(5) to protect attorney

34

SECRET//NOFORN

SECRET//NOFORN

work product information in the Item 2 records.

### (U) *Exemption (b)(6) – Unwarranted Invasions of Personal Privacy*

(90)    (U)  Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  All information that applies to a particular person falls within the scope of Exemption (b)(6).

(91)    (U)  The threshold requirement of Exemption (b)(6) is satisfied here because the FBI protected information that applies to particular people, to include FBI Special Agents; NSD and FISC employees; Carter Page; a third party who provided information that was relied upon in the FISA applications; and personally-identifying information about third parties merely mentioned in the Item 2 records.

(92)    (U)  The FBI asserts Exemption (b)(6) in conjunction with Exemption (b)(7)(C) because they provide overlapping protections for personal privacy.  Accordingly, the FBI's protection of personal privacy interests in this case is addressed further in the Exemption (b)(7)(C) section below.

### (U) *Exemption (b)(7) – Law Enforcement Information*

### (U) *Threshold*

(93)    (U)  The first step in applying any of Exemption (b)(7)'s subparts is to demonstrate that the records or information at issue were compiled for law enforcement purposes.  5 U.S.C. § 552(b)(7).  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement responsibility of the agency.

(94)    (U)  Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as

SECRET//NOFORN

SECRET//NOFORN

implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to:  investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

(95)     (U) As discussed previously, and as has been publicly disclosed, in July 2016, the FBI opened an investigation of the Russian government's efforts to interfere in the 2016 election. The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation.  The FBI thereafter sought and obtained three renewals from the FISC to continue surveilling Page.  Those applications were compiled as part of the FBI's investigation of Russian election interference.

(96)     (U) The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities.  The Russia investigation is clearly within the law enforcement and foreign intelligence responsibilities of the FBI. Similarly, any records reflecting NSD and FBI's efforts to respond to questions from the FISC about the application(s) were compiled in furtherance of this law enforcement purpose.  Thus, Exemption (b)(7)'s threshold is easily satisfied here.

(97)     (U) In May 2017, the Acting Attorney General appointed Special Counsel Robert S. Mueller, III and authorized him to conduct the investigation confirmed by then-FBI Director Comey in Congressional testimony, including "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump;

SECRET//NOFORN

SECRET//NOFORN

and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)). In addition, "[i]f the Special Counsel believes it necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters." *Id.*

(98)    (U) Accordingly, the Page FISA applications and orders are records that were compiled in part for law enforcement purposes, and Exemption (b)(7)'s threshold is easily satisfied here.

(U) *__Exemption (b)(7)(A) – Pending Enforcement Proceedings__*

(99)    (U) Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(100)   (U) Thus, to apply Exemption (b)(7)(A), the FBI must establish the existence of a pending or prospective investigation or other enforcement proceeding and must show a reasonable expectation that disclosure of the withheld information could interfere with that proceeding.

(101)   (U) Here, the enforcement proceeding at risk is the Russian interference investigation. That investigation is pending as of the date of this filing.

(102)   (U) The FBI, in consultation with DOJ, concluded that disclosure of a variety of information in the Page FISA applications and orders, as well as information in the Item 2 records, could reasonably be expected to interfere with the pending Russian election interference investigation if publicly disclosed at this time.

SECRET//NOFORN

SECRET//NOFORN

(103)  (U)  The FBI is limited in the amount of information it can provide publicly about how the investigation may be adversely affected by disclosure of this information without the explanation itself risking harm to the investigation or revealing information exempt under one or more other exemptions.  Although there has been extensive media coverage of the investigation, that coverage often relies on speculation, assumptions, and anonymous/unnamed sources. Greater harm to the investigation would result from official disclosures, regardless of whether it confirmed or refuted widespread media reporting.  That is because official disclosure directly reveals law enforcement activity or lack thereof, removing doubts or ambiguity inherently present in other reporting.

(104)  (U)  Broadly speaking, the redacted/withheld portions of the four Page FISA applications and accompanying orders could reasonably be expected to adversely affect the pending investigation by revealing aspects of the investigation that have not previously been made public; what information or activities are or are not of interest to investigators, and areas where there may be gaps in the investigators' knowledge about such information/activities that could be exploited by targets and other adversaries; who investigators have already spoken with or interviewed and what they said (and did not say); and whether particular persons or entities are or are not of interest in the investigation.

(105)  (U)  Moreover, the FBI has explained herein why particular types of information contained in the four Page FISA applications and accompanying orders are exempt under other exemptions because of the harm associated with disclosure.  While Exemption (b)(7)(A) considers the impact on a specific investigation or investigations, the big-picture risks to law enforcement, national security, and privacy interests addressed by the other exemptions are relevant here, and indeed are more immediate here.

SECRET//NOFORN

SECRET//NOFORN

(106)   (U)  Disclosing information that would identify confidential and/or classified intelligence sources or other individuals who are or could become witnesses risks their compromise through efforts to discredit, harass, or even threaten them.  This, in turn, creates the risk of curtailing their further cooperation, which can significantly hamper an investigation.[18]

(107)   (U)  Similarly, disclosing the evidence, information, or intelligence (including source reporting) already obtained by/known to the FBI risks influencing, compromising, or tainting testimony by other witnesses and/or the fabrication of other information/falsification of other testimony for the purpose of countering or undermining the credibility of the evidence, information, or intelligence already gathered.  It would also reveal gaps in the FBI's knowledge of information, intelligence, or source reporting/witness testimony, which risks destruction or adulteration of evidence or fabrication of false evidence, and attempts to intimidate or improperly influence potential sources/witnesses.

(108)   (U)  Disclosing the investigative techniques already used in this case during specific time periods[19] and regarding specific subject matter areas creates a risk of revealing what investigators already know, what they do not or may not know yet, who is or may be of interest to investigators, and who may be cooperating in the investigation, which, for all reasons

---

[18]  (U) The harms in disclosing information about and from confidential sources is discussed further in the Exemption (b)(7)(D) discussion below.

[19]  (U) Included here would be the FISC docket numbers.  If aggregated with each other and/or other FISC docket numbers, they could be used to pinpoint the times of FISA coverage on Page, which creates the risks discussed here in the Exemption (b)(7)(A) analysis, as well as those in the analysis of Exemption (b)(7)(E), and particularly category (b)(7)(E)-6, below.

(U) Disclosing the use of specific techniques during identified timeframes would allow targets and potential targets to determine the probability that the FBI is aware of particular information likely to be obtained through such techniques during that time as well as the probability that the FBI may not be aware of the information.  Such knowledge could allow targets, potential targets, and others intent on disrupting the investigation to better target their activities toward, for example, creation or destruction of evidence, fabrication of cover stories, intimidation of witnesses, etc.

39

SECRET//NOFORN

discussed above, would adversely affect the investigation.  Moreover, providing details about the use of those techniques risks efforts by targets, subjects, and other adversaries to undermine or thwart the techniques.[20]

(109)  (U)  Consistent with its standard practices, the FBI and SCO have not publicly identified the specific scope/focus of, subjects of, witnesses/sources in, or evidence/information from the pending Russia investigation, beyond the information made public through criminal justice proceedings.  To the extent that information made public in those criminal proceedings exactly matched information in the four Page FISA packages processed in this case, it was not redacted.  Moreover, while unclear that HSPCI's disclosures of the Nunes and Schiff Memos legally precluded the FBI's ability to assert FOIA exemptions over matching information in the four Page FISA packages processed here, the FBI nevertheless did not redact any exactly matching information.  Furthermore, the FBI carefully considered whether to disclose similar information that was not an exact match to the memoranda, and asserted Exemption (b)(7)(A) only upon concluding that disclosure of the non-matching information could reasonably be expected to harm the investigation.

(110)  (S//NF)  ███████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

---

[20] (U)  The risks of circumvention are discussed further in the Exemption (b)(7)(E) descriptions below.

SECRET//NOFORN

███████████████████████████████████████████

██████████████████████████

(111)   (U)  For the reasons discussed above, combined with the justifications for

protecting information under the other exemptions discussed herein, the FBI concluded that

disclosure of information marked as "(b)(7)(A)-1" could reasonably be expected to interfere with

the pending investigation.  Accordingly, the FBI withheld that information pursuant to

Exemption (b)(7)(A).

(U)  *__Exemption (b)(7)(C) – Unwarranted Invasions of Personal Privacy__*

(112)   (U)  Exemption (b)(7)(C) exempts from disclosure "records or information

compiled for law enforcement purposes [when disclosure] could reasonably be expected to

constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

(113)   (U)  As previously noted in the section of this declaration concerning Exemption

(b)(6), the practice of the FBI is to conjunctively assert Exemptions (b)(6) and (b)(7)(C) as they

provide overlapping protections for personal privacy.  Although the balancing test for Exemption

(b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and

the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to

constitute an unwarranted invasion of personal privacy," the analysis and balancing required by

both exemptions is sufficiently similar to warrant a consolidated discussion.  Each exemption

balances individuals' privacy interests against the public's interest in disclosure.

(114)   (U)  For purposes of both exemptions, a public interest exists only when

information would significantly increase the public's understanding of the FBI's performance of

its mission to protect and defend the United States against terrorist and foreign intelligence

threats; uphold and enforce the criminal laws of the United States; and provide leadership and

41

SECRET//NOFORN

SECRET//NOFORN

criminal justice services to federal, state, municipal, and international agencies and partners.

(115)  (U)  The FBI has relied on Exemptions (b)(6) and (b)(7)(C) here to protect the names of or information about FBI Special Agents and FISC and NSD employees; information sufficient to identify a third party who was the source of some information relied upon in the four Page FISA applications; certain personally-identifying and other non-public private information about Carter Page; and personally-identifying information about third parties merely mentioned in the Item 2 records.

(U)  **(b)(6)//(b)(7)(C)-1**       **FBI Special Agents and Support Employees**

(116)   (U)  The FBI withheld the names of the FBI Special Agents who signed the Page FISA applications processed in response to plaintiff's request.  These Special Agents were assigned to the pending Russia investigation during the period covered by the four Page FISA applications and are experienced counterintelligence agents.  The FBI also withheld the names of FBI Special Agents and Support Employees whose names are reflected in the Item 2 records and were assisting with the Russia investigation.

(117)  (U)  The FBI regularly protects the identities of its Special Agents.  FBI agents have access to information regarding official law enforcement investigations, and therefore may become targets of harassing inquiries for unauthorized access to information regarding such investigations if their identities were released.  This is particularly true of agents who work national security cases, including counterintelligence cases, who have access to some of the most sensitive and highly classified information possessed by the FBI.  Assignments of agents to any particular investigation or matter are not by choice.  Publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.  FBI agents also have privacy interests in being

42

SECRET//NOFORN

SECRET//NOFORN

free from unnecessary, unofficial questioning regarding their conduct in particular investigations, whether or not they are currently employed by the FBI. For example, an individual investigated by the FBI may carry a grudge and may seek revenge on the agents involved in that investigation.

(118)  (U)  Many of these concerns are heightened when the agents whose identities are protected work counterintelligence cases. The FBI's counterintelligence mission involves protecting the secrets of the U.S. Intelligence Community from risks of espionage and insider threats; protecting the nation's critical assets; and countering the activities of foreign spies. FBI counterintelligence investigations involve significant threats to the national security of the United States by foreign intelligence services and other hostile government actors. FBI agents responsible for conducting these investigations can be exposed to real and substantial threats to their lives and safety, and the FBI's concerns about targets of such investigations holding grudges against such agents are more acute when those targets are foreign intelligence officers from hostile governments.

(119)  (U)  Here, the above-described reasons led the FBI to conclude that the Special Agents whose names are protected here have substantial privacy interests. That determination is further bolstered by the fact that the investigation and specific investigative activity at issue here are very high-profile and have been the subject of substantial media attention and speculation.

(120)  (U)  The FBI Support Employees referenced in the Item 2 records, including FBI attorneys and other operational personnel, have significant privacy interests in not having their names disclosed here for the same reasons. They were assigned to handle tasks related to the Russia investigation and the Page FISAs specifically, and given their access to information concerning this sensitive investigation, they could become targets of harassing inquiries or

43

SECRET//NOFORN

attempts to improperly access non-public information about it. Accordingly, they have substantial privacy interests in the non-disclosure of their names.

(121)  (U)  In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the four FISA warrants on Page, the conduct of the Russia investigation *writ large*, or any other FBI operations or activities.

(122)  (U)  In the absence of a public interest, the Special Agents' substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C). Accordingly, the FBI properly protected the names of its Special Agents and Support Employees.[21]

(U) **(b)(6)/(b)(7)(C)-2**        **Carter Page**

(123)  (U)  While the declassification of the Nunes Memo and the release of it and the Schiff Memo revealed to the public that Carter Page had been the subject of FISC-authorized surveillance under the FISA, there nevertheless remains information about him contained in the FISA applications and FISC orders that was not made public and in which he retains a privacy interest. Some of this same information is reflected in the Item 2 records. The FBI cannot publicly describe the nature of the information it has protected without revealing information that is exempt under these or other cited exemptions.

(124)  (S//NF)  ███████████████████████████

████████████████████████████████████████████

---

[21]  (U)  These Special Agents and Support Employees are non-executive employees.

44

SECRET//NOFORN



(125)   (S//NF)

(126)   (U)  After concluding that Page retains substantial privacy interests in the redacted information, the FBI considered whether there is any public interest that overrides these privacy interests.  While there is certainly a demonstrated public interest in these FISA applications, the particular information about Carter Page that has been protected here would not so significantly increase the public's understanding of the FBI's operations and activities in relation to obtaining authority from the FISC on four occasions to surveil Page pursuant to the FISA.  Thus, on balance, the FBI concluded that Page's privacy interests outweighed any public interest in the redacted information.

SECRET//NOFORN

(U) __(b)(6)/(b)(7)(C)-3__        __FISC and NSD Employees__

(127)   (U) The information falling within this category consists of the names and titles of a FISC deputy clerk and the NSD attorney who signed and submitted the four Page FISA applications to the FISC, and another NSD attorney who is identified in the Item 2 records. None of these employees is an executive-level employee. The FBI regularly protects the names and identities of employees of other Government agencies or offices who are identified in FBI law enforcement records. The reasons for doing so are similar to the FBI's reasons for protecting the identities of its Special Agents and Support Employees as detailed above.

(128)   (U) Here, the FISC and NSD employees whose identities the FBI protected are in positions to access highly-sensitive and classified information concerning counterintelligence and counterterrorism matters. If their identities were disclosed, they could therefore become targets of harassing inquiries for unauthorized access to non-public information about the four Page FISAs specifically, or more generally, non-public information about other FISC matters, FBI investigations, or IC intelligence activities to which they may have access. Disclosure of their identities would also risk hostile action by adverse foreign powers, either by way of revenge or of actively targeting them in intelligence-gathering operations.

(129)   (U) In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the four FISA warrants on Page, the conduct of the Russia investigation *writ large*, or other FBI operations or activities.

(130)   (U) In the absence of a public interest, these employees' substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C).

SECRET//NOFORN

Accordingly, the FBI properly protected the names and titles of these FISC and NSD employees.[22]

## (U) (b)(6)/(b)(7)(C)-4 Third Party Who Was a Source of Information Relied Upon in the Carter Page FISA Applications

(131) (U) The FBI protected information that would identify an individual who was a source of information that came into the FBI's possession during a particular phase of the investigation. This identifying information appears on one page in the third FISA application and one page in the fourth FISA package.[23]

(132) (U) Individuals identified in FBI investigative materials have substantial privacy interests in not being publicly linked with a sensitive national security investigation. Such public exposure could subject the individuals to harassment, intimidation, or threats of legal or economic reprisal; possible physical harm; or even death. These considerations led the FBI to conclude that this individual has substantial privacy interests here, particularly considering that the investigation is a sensitive investigation involving the activities of a foreign government and has received such wide-spread attention. In contrast, the identity of this individual who is mentioned in a single footnote in two of the applications would not, without more, significantly increase the public's understanding of FBI operations or activities. Accordingly, the FBI concluded that this individual's privacy interests outweighed any public interest in his/her identity, and protected the information under Exemptions (b)(6) and (b)(7)(C).

---

[22] (U) Information about the NSD employees was also redacted pursuant to Exemptions (b)(6) and (b)(7)(C) at NSD's request.

[23] (U) The particular identifying information about this third party is not classified and the individual did not provide information directly to the FBI as part of its investigation. Accordingly, the FBI has not cited Exemptions (b)(1) or (b)(7)(D) to protect this particular individual.

SECRET//NOFORN

SECRET//NOFORN

(U)  (b)(6)/(b)(7)(C)-5        **Names and/or Identifying Information of Third Parties Merely Mentioned in the Item 2 Records**

(133)  (U)  The FBI protected information that would identify third parties who were merely mentioned in the Item 2 records.  These are individuals who came into contact with Page or otherwise had some connection with him but are otherwise of no investigative interest to the FBI.  They maintain substantial privacy interests in not having this information disclosed and thus, being connected with a high-profile counterintelligence investigation through an official disclosure by the FBI.  In contrast, disclosure of these individuals' identities would not significantly increase the public's understanding of the FBI's operations and activities in relation to the four Page FISA applications, the Russia investigation, or other FBI matters.  Accordingly, the FBI properly protected these individuals' privacy interests pursuant to Exemptions (b)(6) and (b)(7)(C).

### (U) *Exemption (b)(7)(D) – Confidential Source Information*

(134)  (U)  Exemption (b)(7)(D) protects records or information compiled for law enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by the confidential source.

5 U.S.C. § 552(b)(7)(D).  Exemption (b)(7)(D) provides categorical protection for the identities of confidential sources, as well as information provided by such a source in a criminal or national security investigation.  No balancing of interests is required and the public's interest in the information is not a factor.  Rather, once the FBI establishes that the source provided

SECRET//NOFORN

SECRET//NOFORN

information under express or implied assurances of confidentiality, the identity of the source and all information the source provided in a criminal or national security investigation are exempt under Exemption (b)(7)(D).

(135)  (U)  The FBI regularly relies on confidential sources.  Confidential sources may provide information under express assurances of confidentiality, and are "informants" within the common meaning of the term, although the FBI refers to them as "Confidential Human Sources" or "CHSs."  Alternatively, confidential sources may provide information under circumstances from which assurances of confidentiality may be inferred.  In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. Information provided by these sources is singular in nature, and if released, could reveal their identities.  Sources must feel free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public and that they may, as a result, face reprisals. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(136)  (U)  The release of a source's identity could forever eliminate that source as a future means of obtaining information, and also has a chilling effect on the cooperation of other sources.  Revealing the identities of confidential sources risks one of the FBI's most important means of collecting information and intelligence, and severely hampers law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal and national security laws.

(137)  (U)  As a result of the declassification of the Nunes Memo, and the release of both

SECRET//NOFORN

SECRET//NOFORN

of the HSPCI memoranda, it was publicly revealed that the FBI relied on a confidential and classified intelligence source, referred to throughout the Page FISA applications as "Source #1." The FBI has not protected information about this source's identity, nor has it protected information he provided that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter. The FBI has protected information that would identify the identities of other confidential sources who provided information or intelligence to the FBI; information provided by those sources; and information provided by Source #1 that does not match information revealed in the HPSCI memoranda or the Grassley/Graham letter.

(138)  (U) Source #1 was a code-named CHS for the FBI. By definition, such sources are confidential. That is, as part of the FBI's protocols for CHSs, they are provided express assurances of confidentiality. Moreover, Source #1 provided information in furtherance of a sensitive national security investigation being conducted by the FBI. Accordingly, under the second clause of Exemption (b)(7)(D), any information he provided is categorically exempt. Thus, except as to information that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter, the FBI redacted all information provided by Source #1. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-303, 309-310, and 312-317.

(139)  (U) The FISA applications, and the Item 2 records, also contain information about and from other sources who cooperated with and provided information to the FBI under express assurances of confidentiality. CHSs are provided express assurances of confidentiality by the FBI. Accordingly, the FBI concluded that the requirements for express assurances of confidentiality had been satisfied here. Further description of the bases for this conclusion as to the FISA applications cannot be discussed publicly without disclosing information that is exempt

50

SECRET//NOFORN

SECRET//NOFORN

under this or one of the other exemptions cited in relation to this information.  However, because these sources cooperated with and provided information to the FBI in furtherance of a national security (intelligence) investigation under express assurances of confidentiality, the requirements of Exemption (b)(7)(D) are satisfied and the FBI properly protected information that would reveal the identities of the sources, as well as the information that they provided to the FBI. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-301-302, 308-311, and 317-318.

(140)  (S//NF) ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

### (U) *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(141)   (U)  Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when release] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations.  It protects techniques and procedures that are not well-known to the public as well as non-public details about the use of publicly-known techniques and procedures.

51

SECRET//NOFORN

SECRET//NOFORN

(U) **(b)(7)(E)-1**      **Investigative Focus**

(142)  (U)  Many investigative steps preceded the FBI's FISA applications; the four Page FISA applications and orders reveal how the FBI conducted certain aspects of the investigation to that date and a road-map of certain contemplated investigative steps (*i.e.*, the requested surveillance).  Moreover, information in the Item 2 records reflects a snapshot of investigative steps taken to that date and a specific investigative technique and activity for which the FBI was seeking authority at and for a particular period time.  Although the general techniques authorized by the FISA are publicly known, this detailed information about how, when, where, and why such authorities are employed in a particular investigation is not publicly known.  This type of detailed information would be valuable to criminals and adversaries as a guide to adjusting their behaviors, taking evasive actions, and developing countermeasures to thwart FBI investigations.  Accordingly, the FBI protected this information under Exemption (b)(7)(E) in order to the risk of circumvention posed by disclosure of this information.

(U) **(b)(7)(E)-2**      **Collection and/or Analysis of Information**

(143)  (U)  Category (b)(7)(E)-2 includes information that reveals the methods used by the FBI to collect and analyze information it obtains for investigative purposes.[24]

(144)  (S//NF)  ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

---

[24] (U) This information overlaps with the information protected in category (b)(7)(E)-3, which protects specific investigative techniques authorized and utilized in national security investigations inasmuch as the FBI's methods for collecting information and the types of techniques it is authorized to use in national security investigations will, in the context of these records, generally be the same thing.  The FBI cited category (b)(7)(E)-3 in every instance that it cited category (b)(7)(E)-2.

SECRET//NOFORN

████████████████████████████████

(145)   (U)  The release of this information would disclose the methods used in the collection and analysis of information, including how and from where the FBI collects particular types of information and the methodologies employed to analyze it once collected.  Such disclosures would enable subjects of FBI investigations to identify when these or similar currently used techniques are being used and then take evasive actions or countermeasures to circumvent them.  This would diminish the relative utility of these techniques and facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained.  Accordingly, to protect the viability of these techniques, the FBI protected this information under Exemption (b)(7)(E).

(U)  <u>__(b)(7)(E)-3__</u>      <u>Specific Techniques Authorized for and Used in National Security Investigations</u>

(146)   (U)  The FBI protected information that would reveal the specific techniques that the FBI is authorized to and in fact uses in national security investigations.  In this context, the techniques were referenced because they were used in the context of *this* national security investigation but their disclosure here would also have ramifications for the use of these techniques in other national security cases. The FBI has a toolbox of investigative techniques that it uses in national security (counterintelligence and counterterrorism) cases, which overlap in many respects with its criminal investigative toolbox, although the FBI obviously has one significant and different tool in the national security toolbox – FISA.  This category covers non-public information about all of the techniques referenced in the Page FISA applications and orders, and the Item 2 records, including those that have not been publicly disclosed in relation to

SECRET//NOFORN

investigative actions taken in this investigation; those that have been publicly disclosed in relation to this investigation, such as CHSs; and those under the FISA that the FISC authorized the FBI to use here.  Although techniques authorized by the FISA are publicly known, this detailed information about how, when, where, and why such authorities are employed in a particular investigation is not publicly known.

      (147)  (S//NF)



      (148)  (U)  Here, the context in which these techniques are discussed reveals details about when in an investigation a particular technique might be utilized, the types of information that might be sought via the technique, and the limitations on its use and/or utility; what techniques might be used in combination; and non-public information about how the techniques are implemented.  When aggregated, as it is here, this information can paint a road-map of how a national security, and in particular a counterintelligence, investigation is conducted.[25]  Disclosure

---

[25] (U) The FISA applications explain the investigative steps taken prior to seeking FISA coverage, as well as the information that the FBI was able to obtain using them, which formed the probable cause necessary to obtain a FISA warrant.

SECRET//NOFORN

of such a road-map here and over time would give sophisticated criminals and adversaries the information necessary to adjust their activities and take effective countermeasures to circumvent the FBI's investigative and intelligence-gathering efforts.  Accordingly, the FBI protected this information under Exemption (b)(7)(E) here.

(U)  **(b)(7)(E)-4**        **Specific Databases Used by the FBI for Investigative and Law Enforcement Purposes**

(149)   (U)  The FBI protected its use of several non-public databases that it relied on to obtain/confirm information and intelligence gathered in the course of its investigation.  These databases are accessible to law enforcement personnel to conduct queries of or for particular types of information for law enforcement and intelligence gathering purposes.  The databases protected include those exclusive to the FBI as well as others that are available to other federal government law enforcement personnel.  These databases are essentially "one-stop" shops where the FBI can query already-gathered information in order to corroborate or refute it, and/or obtain new or additional information in order to develop investigative leads.   It is not publicly known when and under what circumstances the FBI utilizes these particular databases, particularly in the context of a national security/counterintelligence investigation.  Armed with such information, spies, criminals, and others intent on avoiding FBI attention could develop countermeasures to avoid detection, which would impede the FBI's ability to effectively conduct national security and criminal investigations.

(U)  **(b)(7)(E)-5**        **Monetary Payments in Relation to Utilization of Investigative Techniques**

(150)   (U)  The FBI protected specific information about payments to CHSs on two pages of each FISA application.  While it is publicly known that the FBI pays CHSs under some circumstances, the details of when, for what, and how much CHSs are paid are aspects of this

SECRET//NOFORN

technique that are not made public, in order to protect the viability of the technique. Without adequate context, the particular amount paid to a CHS could be viewed to suggest the relative volume of information provided by a particular CHS, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's activities.

(151)   (U)   Finally, disclosing the amounts paid to CHSs in a particular investigation or for particular types of information would reveal non-public information about the level of resources devoted to particular investigations or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions. Revealing the amount of money the FBI has paid to particular CHSs in particular investigations and over particular periods of time would reveal the FBI's emphasis on certain investigations or intelligence gathering efforts. Revealing this emphasis would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular types of investigations or particular FBI threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence gathering and criminal investigative activities. This would give sophisticated criminals and adversaries the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI strength areas and exploit the weak ones. Accordingly, the FBI protected payment information under Exemption (b)(7)(E) in this case.

(U)   **(b)(7)(E)-6**          **Targets, Dates, and Scope of Surveillance**

(152)   (U)   While it is known that the FBI conducts surveillance authorized under the

56

SECRET//NOFORN

SECRET//NOFORN

FISA, as well as other types of authorized surveillance, and while it is known that there was surveillance conducted here, the details about how the surveillance was implemented (investigatively and/or technically), the locations targeted by the surveillance, and the specific time period(s) during which the surveillance was conducted are not public and were not disclosed in the HPSCI memoranda.[26]  These non-public details about the conduct of surveillance, particularly surveillance authorized under the FISA, are utilized by the FBI in other current investigations.  Disclosure of non-public details about when and how the FBI conducts surveillance and the circumstances under which the FBI will seek authority to do so would, over time, create a mosaic that criminals and other adversaries could use to predict when and where surveillance may occur, detect it when it is occurring, and develop and utilize countermeasures to defeat or avoid different types of surveillances.  Accordingly, the FBI protected this information under Exemption (b)(7)(E) in the FISA applications and resulting orders, and in the Item 2 records, in order to preserve the usefulness and utility of this technique.

(U)  **(b)(7)(E)-7**      **Dates and Types of Investigations**

(153)  (U)  On one page in each of the FISA applications, the FBI protected information that, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation, and the time period of the particular investigation.  Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and the particular dates that the investigation covers, which would

_____

[26] (U)  This includes, for example, the FISC docket numbers, the specific dates that the FISA applications were filed and orders issued, and the declassification dates in the classification stamps (which can be used to pinpoint the dates of the applications and orders).  All of this information reveals the specific time period(s) under which the surveillance was conducted.

57

SECRET//NOFORN

SECRET//NOFORN

allow targets to identify what activities might be under investigation and to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

(U)  **(b)(7)(E)-8**      **Investigative Strategies for Utilizing Particular Evidence**

(154)  (U)  The FBI protected information, which was repeated in each of the four FISA applications, that describes a particular purpose for which it might use information gathered as a result of its FISA authorized surveillance on Page. This information reflects non-public information about how the FBI investigatively uses information that it gathers during an investigation. While the particular context here concerns information gathered as a result of its utilization of FISA, the same potential uses of investigative information could be present in many other contexts. Publicly disclosing this information would permit targets of FBI investigative activities to anticipate FBI investigative activities, and this in turn would permit them to take countermeasures against such activities. This would abrogate the usefulness of FISA as a technique, at least in this particular and important regard, as well as the investigative activities that may flow as a result of information obtained under FISA. No further information about this category of information or how it falls within Exemption (b)(7)(E) can be made on the public record without undermining the FBI's assertion of this exemption, as well as Exemptions (b)(1), (b)(3), and (b)(7)(A), which were also asserted to protect this information.

(155)  (S)  ███████████████████

███████████████████████████████

SECRET//NOFORN

SECRET//NOFORN

████████████████████████████████

████████████████████████████████

████████████████████

(U) **(b)(7)(E)-9** .   **Code Name**

(156)  (U)  A code name is unique and assigned solely to a particular investigation. Code names are used in lieu of the actual name, description, and information concerning a specific investigation of national security interest.  Public disclosure of a code name may allow an adversary or hostile analyst to patch bits and pieces of information together that, once assembled, will inform them of the possible range of our intelligence capabilities and penetration, and the extent of the intelligence that the FBI has likely already gathered.  A particular investigation's code name may be used or referenced throughout multiple cases and in relation to multiple intelligence sources/activities, thus connecting those cases, sources, and intelligence activities.  Applying a mosaic analysis, adversaries could use these code names in conjunction with other information known about other investigations, law enforcement techniques, or intelligence sources and activities to develop countermeasures to avoid detection, to compromise evidence and witnesses, and to take other actions designed to thwart law enforcement and circumvent the law.  Accordingly, the FBI protected this information from the Item 2 records pursuant to Exemption (b)(7)(E).

(U)  SEGREGABILITY DETERMINATIONS FOR RELEASED IN PART PAGES

(157)  (U)  Each page of the four Page FISA applications and accompanying orders was carefully reviewed by a team of DOJ employees to determine what portions of the pages contained exempt information requiring redaction pursuant to the FOIA, what portions could be segregated and released, and what pages did not contain any segregable information and had to

SECRET//NOFORN

be withheld in full.  As part of this review, the employees carefully analyzed all information in the four Page FISA applications and resulting orders to determine what information has been revealed through the HPSCI memoranda and/or officially, publicly disclosed, and to ensure that no information for which FOIA exemptions were or likely have been waived was redacted.  A total of 598 pages of responsive records were carefully reviewed and analyzed, and it was determined that 412 pages could be released in part and that 186 pages had to be withheld in full, in order to protect the classified and otherwise exempt information contained therein.

### (U) SEGREGABILITY DETERMINATIONS FOR ITEM 2 WITHHELD IN FULL PAGES

(158)   (U)  The FBI also withheld in full 21 pages responsive to Item 2 of plaintiff's request.  The FBI conducted a line-by-line review of the responsive information and after all information exempt under all applicable exemptions was identified, whatever non-exempt information exists is so intertwined with exempt information that it is not reasonably possible to segregate and release the non-exempt information, or doing so would result in the disclosure of nothing but meaningless words or sentence fragments.  Accordingly, the FBI withheld the 21 pages in full after concluding that there is no reasonably segregable, non-exempt information that can be released from them.

### (U) PAGES WITHHELD IN FULL – PAGE FISAs

(159)   (U)  The FBI withheld in full 186 pages associated with the FISA applications and resulting orders pursuant to Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E) (categories 1-3 and 6).[27]  Disclosure of these pages would reveal classified intelligence methods and law enforcement techniques; however, the FBI cannot publicly describe these pages and the bases for

---

[27] (U)  Discrete information in the records would be subject to redaction pursuant Exemptions (b)(6) and (b)(7)(C), as described in the category (b)(6)/(b)(7)(C)-2 discussion above.

SECRET//NOFORN

withholding them any further without revealing information that is itself exempt.

(160)   (S//NF)  The FBI withheld 186 pages in full in responding to plaintiff's FOIA

request. ████████████████████████████████████████████████████

████████████████████████████████████ They were

withheld in full pursuant to a combination of Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E)

(categories 1-3 and 6).

(161)   (S//NF) ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

(162)   (S//NF) ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

SECRET//NOFORN

(163)  (S//NF) ████████████████████████████



(164)  (S//NF) ████████████████████████████

(165)  (S//NF) ████████████████████████████

SECRET//NOFORN

SECRET//NOFORN



### (U) **PARTIAL GLOMAR RESPONSE**

(166)  (U)  The FBI relies on a Glomar response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions.  To be credible and effective, the FBI must use a Glomar response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist.

(167)  (U)  Here, the FBI has determined that merely acknowledging the existence or non-existence of any records responsive to plaintiff's request, beyond the four Carter Page FISA applications and resulting FISC orders, the Item 2 records, and former Director Comey's March 20, 2017 statement that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in President Trump's March 4, 2017 tweets, could trigger harm under

SECRET//NOFORN

SECRET//NOFORN

FOIA exemptions. With limited exceptions, such as the unique circumstances giving rise to the FBI's processing and release of the four Page FISA packages, the FBI does not and cannot publicly confirm or deny FISA coverage on particular individuals or entities, or that FISC orders have been sought or obtained in the conduct of any particular investigation. As no authorized Executive Branch official has acknowledged the existence or non-existence of FISA warrants, applications and orders beyond the four on Carter Page, the FBI's partial Glomar response as to any other responsive records remains proper.[28]

(168)  (U) As an original classification authority, I have determined that the FBI can neither confirm nor deny whether the FBI maintains responsive records because to do so could reasonably be expected to compromise national security and/or reveal intelligence activities, sources, or methods. *See* 5 U.S.C. §§ 552(b)(1), (b)(3).

(169)  (U) Moreover, acknowledging or denying the existence or non-existence of records could result in harms protected against by FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A).

A.  (U) As previously described, on March 20, 2017, then-FBI Director

---

[28] (U) On March 20, 2017, then FBI Director James B. Comey specifically addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama had had President Trump's " 'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The Department has no information that supports those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017. https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf (last accessed 6/12/2017). Aside from this statement and the acknowledgment of the four Page FISA applications and accompanying FISC orders, neither the FBI not DOJ have publicly commented on or acknowledged the existence or non-existence of any other FISA records within the scope of plaintiff's FOIA request.

SECRET//NOFORN

Comey publicly confirmed the existence of an investigation into Russia's interference in the 2016 Presidential election. *See* Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation). On May 17, 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the investigation confirmed by then-FBI Director Comey on March 20, 2017.   DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)).

        B.     (U)  As plaintiff specifically requested FISA/FISC records related to Russian interference in the 2016 election, the FBI cannot confirm or deny the existence or non-existence of responsive records, beyond those already acknowledged and processed, because that could reasonably be expected to adversely affect the pending investigation.

      (170)  (U)  Finally, acknowledging the existence or non-existence of any other responsive records could reasonably be expected to risk circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E).

     (U)  **FOIA EXEMPTION (b)(1) AS A BASIS FOR THE PARTIAL GLOMAR RESPONSE**

      (171)  (U)  FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

      (172)  (U)  E.O. 13526 § 1.1(a) provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced

65

SECRET//NOFORN

by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

(173)   (U)  E.O. 13526 explicitly authorizes precisely the type of response that the FBI has provided to plaintiff in this case.  Specifically, § 3.6(a) provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."

(174)   (U)  Consistent with E.O. 13526 and as described below, I have determined that acknowledging the existence or nonexistence of the records requested by plaintiff, beyond the four Carter Page FISA applications and orders discussed in detail above, would require the FBI to disclose properly classified facts that concern § 1.4(c) ("intelligence activities, sources, and methods") and § 1.4(d) ("foreign relations and foreign activities of the United States"). Moreover, responsive records, if they exist, would be owned by and under the control of the U.S. Government.  Finally, I have determined that acknowledging the existence or non-existence of the requested records reasonably could be expected to result in damage to national security.

(175)   (U)  My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to

SECRET//NOFORN

SECRET//NOFORN

prevent or delay the release of information that does not require protection in the interests of national security.[29]

### (U) *Intelligence Activities, Sources, and Methods*

(176)  (U)  The records requested by plaintiffs, if they exist, implicate classified intelligence activities and methods, and acknowledging the existence or non-existence of any such records reasonably can be expected to cause damage to national security.  An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.  An intelligence activity or method has two characteristics.  First, the intelligence activity or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(177)  (U)  Intelligence activities and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness.  Intelligence activities and methods are valuable only so long as they remain unknown and unsuspected.  Once an intelligence activity or method

---

[29]  (U)  To the extent possible on the public record, I have explained the harm to national security that would result from confirming or denying the existence or non-existence responsive records here.  If the Court finds that explanation inadequate, Defendants could offer further explanation *ex parte* and *in camera*.

SECRET//NOFORN

SECRET//NOFORN

– or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(178)  (U)  The U.S. Government must do more than prevent explicit references to an intelligence activity or method; it must also prevent indirect references to them.  One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.  We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.  Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(179)  (U)  Here, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and resulting FISC orders, the Item 2 records, and former Director Comey's March 20, 2017 statement that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in President Trump's March 4, 2017 tweets, would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations.  The FBI has not confirmed or denied the existence of any other FISA surveillance records responsive to plaintiff's request.  Confirming or denying whether any or not other responsive records exist would reveal otherwise non-public information regarding the nature of the FBI's intelligence interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.  Accordingly, to confirm or deny that the FBI possesses or does not possess records responsive to plaintiff's request could risk

SECRET//NOFORN

SECRET//NOFORN

compromising intelligence activities or methods, and thus would pose at least a serious risk to the national security.[30]

### (U) *Foreign Relations and Foreign Activities of the United States*

(180)   (U)   Responding to plaintiff's request with anything other than a Glomar response would also reveal information concerning U.S. foreign relations and foreign activities, the disclosure of which reasonably can be expected to cause damage to national security.  Plaintiff's request necessarily implicates U.S. foreign relations and foreign activities in relation to foreign governments or government officials/employees.

(181)   (U)   FISA prescribes procedures for the physical and electronic surveillance and collection of "foreign intelligence information" between "foreign powers" and "agents of foreign powers" suspected of espionage or terrorism.  Thus, on its face, a request for information about FISA materials implicates foreign relations and foreign activities because those are at the heart of the FBI's use of FISA as an intelligence and investigative tool.

(182)   (U)   The FBI's confirmation or denial of the existence of responsive records could reasonably be expected to cause damage to the national security interests of the United States by negatively impacting U.S. foreign relations with these and other countries.  Given the sensitivity of the United States' present and future relationships with foreign countries and the importance of such relationships to our national security, requests like plaintiff's—which, directly or indirectly, call for records that would relate to sensitive and appropriately classified details of the United States' relationship with foreign government(s)—reflect precisely the situation in which the FBI finds it necessary to assert a partial Glomar response to plaintiff's request.

---

[30] (U) FISC orders, applications, and minimization procedures are classified, at a minimum, at the SECRET level.

SECRET//NOFORN

SECRET//NOFORN

(183)  (S//NF) 

(184)  (U)  Accordingly, confirming or denying the existence or non-existence of particular FISA records can reasonably be expected to cause serious damage to the national security by undermining our relationships with foreign partners.

(U)  **FOIA EXEMPTION (b)(3) AS A BASIS FOR THE PARTIAL GLOMAR RESPONSE**

(185)  (U)  Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a

70

SECRET//NOFORN

SECRET//NOFORN

manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3)(A). If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it must specifically cite this paragraph in order for Exemption (b)(3) to apply. *Id.* at § 552(b)(3)(B).

(186)   (U)  Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1 (i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" under 5 U.S.C. § 552(b)(3). Under the direction of the DNI, other components within the U.S. Government are authorized to protect intelligence sources and methods from unauthorized disclosure.

(187)   (U)  As previously described in relation to the Exemption (b)(1) Glomar explanation, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, would tend to reveal whether an intelligence method[31] is being deployed against a particular target or organization, thus compromising the national security interests of the United States. Accordingly, the National Security Act, in conjunction with Exemption (b)(3), provides an additional and independent basis for the FBI's partial Glomar response to plaintiff's request.

---

[31] (U) An intelligence method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest; any procedure (human or non-human) or intelligence source, used to obtain information concerning the individual or organization; and foreign liaison relationships.

SECRET//NOFORN

SECRET//NOFORN

### (U) FOIA EXEMPTIONS (b)(7)(A) AND (b)(7)(E) AS BASES FOR THE GLOMAR RESPONSE

#### (U) *Exemption (b)(7) Threshold*

(188)   (U)   As discussed above, before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.   Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(189)   (U)   The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities.   Accordingly, FISA applications and FISC orders – when they exist – are records compiled for law enforcement purposes.

#### (U) *Exemption (b)(7)(A)*

(190)   (U)   FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings."   5 U.S.C. § 552(b)(7)(A).

(191)   (U)   In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

(192)   (U)   As previously noted, in July 2016, the FBI opened an investigation of Russian election interference.   The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation. The FBI thereafter sought and obtained three renewals from the FISC to continue surveilling Page.   The FISA applications

SECRET//NOFORN

SECRET//NOFORN

were compiled as part of the investigation into Russian election interference.  In May 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the Russian election interference investigation confirmed by then-FBI Director James Comey on March 20, 2017.  That investigation is on-going.  Plaintiff's request specifically seeks FISA applications and FISC orders related to the Russian election interference investigation.  Thus, the requirement of a pending enforcement proceeding in Exemption (b)(7)(A) is satisfied.

(193)  (U)  The final element – interference with that investigation – is readily established.  Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation.  Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  Prematurely disclosing non-public information about the Russia investigation could give targets and others intent on interfering with the FBI's investigative efforts the information necessary to:  take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.  Accordingly, confirming or denying the existence or non-existence of responsive records, beyond the four Carter Page FISA applications and orders discussed in detail above, could reasonably be expected to adversely affect the pending investigation.  Therefore, the FBI's partial Glomar response is justified under Exemption (b)(7)(A) as well.

SECRET//NOFORN

SECRET//NOFORN

### (U) *Exemption (b)(7)(E)*

(194)   (U)  Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E).  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(195)   (U)  How the FBI applies its investigative resources (or not) against a particular allegation, report of criminal activity, or perceived threat is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E).

(196)   (U)  As previously demonstrated, acknowledging or denying the existence or non-existence of the law enforcement records that plaintiff seeks, beyond the four Carter Page FISA applications and orders discussed in detail above, would be tantamount to confirming or denying whether or not the FBI is employing specific investigative techniques authorized under the FISA against specific targets as part of the pending Russian interference investigation.  Even in acknowledged investigations, the FBI does not routinely disclose whether or not it has employed this particular classified investigative technique against a particular target.  Such an acknowledgment would reveal when and under what circumstances the FBI relies upon FISA-authorized techniques in an investigation.   Confirming whether or not FBI has responsive records would provide pieces of information that adversaries could use to ascertain at what point, and against whom we might use particular techniques.  Armed with this information, adversaries

SECRET//NOFORN

SECRET//NOFORN

could glean significant insight into the activities likely to attract – or not attract – the FBI's law enforcement attention.  These individuals would then be able alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing threats and investigating crimes.  Therefore, the FBI can neither confirm nor deny the existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, without causing harms protected against by FOIA Exemption (b)(7)(E), and Exemption (b)(7)(E) provides independent justification for the FBI's partial Glomar response here.

## (U)  **CONCLUSION**

(197)  (U)  For the reasons described above, the FBI's Glomar response to plaintiff's request, except as to records that have been officially publicly revealed, was proper; the FBI's search for records responsive to the portion of plaintiff's request for which the Glomar response has been pierced – *i.e.*, the four FISA applications and orders on Carter Page revealed in the HPSCI memoranda and the Item 2 records – was reasonably calculated to, and in fact did, locate the responsive records; the FBI properly protected information in the four Page FISA applications and orders pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), and (b)(7)(A) and (C)-(E); and the FBI reasonably segregated and released non-exempt information on the pages released in part and properly concluded that it could not do so on the pages withheld in full.

SECRET//NOFORN

SECRET//NOFORN

(U)  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through G attached hereto are true and correct copies.

(U)  Executed this 12th day of October, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

SECRET//NOFORN